**2022-CC09874**

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

## IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
## STATE OF MISSOURI

EUGENE FORD )
)
       Plaintiff, )
)
v. )
)
R.J. REYNOLDS TOBACCO )    Case No.:
COMPANY, a foreign corporation, as )    Division No.:
successor-by-merger to Lorillard )
Tobacco Company, individually and )
as successor-in-interest to the )
U.S. tobacco business of Brown & )
Williamson Tobacco Corporation )
(n/k/a Brown & Williamson Holdings )
Inc.) and individually as successor-by- )
merger to American Tobacco Company )
)
Serve:  Registered Agent )
        CSC-Lawyers Incorporating )
        Services, Inc. )
        221 Bolivar Street )
        Jefferson City, MO  65101 )
and )
)
SCHNUCK MARKETS, Inc., a domestic )
corporation. )
)
Serve:  Registered Agent )
        Mary H. Moorkamp )
        11420 Lackland Road )
        Box 46928 )
        St. Louis, MO  63146 )
)
        Defendants. )
)

## PETITION

COMES NOW, Plaintiff Eugene Ford ("Ford"), by and through undersigned

counsel and hereby brings this action against R.J. Reynolds Tobacco Company

(RJR) and Schnuck Markets, Inc., ("Schnucks") in this products liability action

and alleges:

Exhibit A

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

## INTRODUCTION

Plaintiff brings this cause of action against Defendants for injuries sustained as a result of smoking RJR, and Brown & Williamson Tobacco Corporation's ("B & W"), unreasonably dangerous and defective cigarette products, including, Winston Kool, and Salem.  More specifically, Plaintiff's claims involve Schnuck's wrongful conduct in connection with the distribution and/or sale of RJR and B & W cigarettes, including, Winston Kool, and Salem. As well, Plaintiff's claims involve RJR, and B & W's negligent, willful, intentional and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of cigarette products, including Winston, Kool, and Salem cigarettes.  As a direct and proximate cause of Plaintiff's exposure to the carcinogens and other toxic substances in RJR, and B & W's cigarettes, he developed lung cancer.

## ALLEGATIONS COMMON TO ALL COUNTS

### PARTIES AND RELEVANT NON-PARTIES

1.      Plaintiff Eugene Ford is a resident and citizen of the State of Missouri, who was born on ██████████, 1957 in the State of Arkansas but lived in St. Louis as an infant and continues to reside in St. Louis.

2.      Defendant RJR, individually and as successor-by-merger to Lorillard Tobacco Company ("Lorillard"), individually and as successor-in-interest to the U.S. tobacco business of Brown & Williamson Tobacco Corporation ("B & W") (k/n/a Brown & Williamson Holdings, Inc), and individually and as successor-by-merger to the American Tobacco Company, is a North Carolina Corporation with its principal place of business located in the State of North Carolina.  This

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

Defendant conducts business in the State of Missouri, including St. Louis City and St. Louis County and did so during all times relevant to this action.

3.      At all times material to this action, from in or around 1954 and continuing until June 12, 2015, RJR engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of cigarette products, including Winston cigarettes, which Ford smoked and inhaled and which in combination with other cigarettes Ford smoked and inhaled caused and/or directly contributed to the development of his lung cancer.

4.      At all times material to this action, from in or around 1956 and continuing until June 12, 2015, RJR engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of cigarette products, including Salem cigarettes, which Ford smoked and inhaled and which in combination with other cigarettes Ford smoked and inhaled caused and/or directly contributed to the development of his lung cancer.

5.      At all times material to this cause of action, until mid-2004, B & W engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of the cigarette products, including, among others, Kool cigarettes, which Ford smoked and inhaled and in combination with the other cigarette products he smoked, caused and/or directly contributed to the development of his lung cancer.

6.      By virtue of R.J. Reynolds Tobacco Holdings Inc.'s 2004 acquisition of B & W, RJR became successor-in-interest to the United States Tobacco business of B & W (n/k/a Brown & Williamson Holdings, Inc.), and assumed B & W's liabilities and indemnified it against future tobacco litigation.  Subsequently,

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

as a result of Reynolds American Inc's acquisition of Lorillard Tobacco Company, on June 12, 2015, Reynolds American Inc. agreed to sell certain of its cigarette brands, including Winston, Kool and Salem cigarettes, to Imperial Tobacco Group, Plc.  As part of the sale, RJR agreed to continue to assume all litigation liabilities relative to Winston, Kool and Salem cigarettes.

7.     Defendant Schnucks, is a Domestic Corporation with its principal office in St. Louis County, Missouri and transacts business, through its various grocery stores, throughout Missouri, including St. Louis County and St. Louis City, including but not limited to, at least up until 2020, promoting, selling and/or placing into the stream of commerce cigarette products, including, Winston, Kool and Salem, which Ford purchased from Schnucks stores in the St. Louis City and County areas and smoked and inhaled and which, in combination with other cigarettes he smoked, caused and/or directly contributed to the development of his lung cancer.

8.     The Counsel for Tobacco Research – USA, Inc. ("CTR") and the Tobacco Institute, Inc. ("TI"), at all times relevant to this action, were involved in promotion, lobbying, medical research, legislative and political activities or related ventures, in connection with and on behalf of RJR and other cigarette companies, throughout Missouri and the United States.

**JURISDICTION AND VENUE**

9.     Jurisdiction is proper in this Court as Defendants conduct business in this jurisdiction.  Venue is proper in this Court, pursuant to Missouri Revised Statutes 508.010.4 because at the time Ford was first injured inside the State of

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

Missouri by Defendants' wrongful acts or negligent conduct, he was in the City of St. Louis.

## IMPORTANT TOBACCO CONSTITUENTS

10.    The particulates that result from burning tobacco are collectively known as "tar."  The tar is the element in cigarettes that contains various carcinogenic chemicals along with other toxic chemicals, which, with repeated exposure, cause various cancers, including lung cancer.

11.    Nicotine, a dangerous drug, occurs naturally in the tobacco plant and is addictive.  When a cigarette is smoked, the nicotine in the tobacco is carried on the tar into the lungs.  From there, the nicotine gets absorbed into the bloodstream and arrives at the brain within about seven to ten seconds.  In the brain or in the lungs, nicotine binds to nicotinic acetylcholine receptors, which triggers the release of various hormones, including dopamine, norepinephrine and acetylcholine.  The release of these hormones causes the smoker to feel good, satisfies the craving for food, helps the smoker feel more alert and assists with arousal and cognitive function.

12.    Repeated smoking cigarettes with addictive levels of nicotine results in certain brain changes known as neuroplasticity, meaning new brain circuits or connections.  These physiological changes from nicotine cause the smoker to feel withdrawal symptoms when the nicotine level in the brain drops below the level to which the smoker is accustomed.  These symptoms include feelings of nervousness, edginess and anxiousness.  The antidote to replenish the low level of nicotine in the brain is another cigarette.

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

13.     Menthol is an anesthetizing agent that, when added to the tobacco in a cigarette, numbs the sensory organs in the throat, making it easier to inhale the smoke more deeply, allowing more nicotine to be delivered to the body.  By making cigarette smoke milder and easier to inhale, menthol makes it easier for young people to start to smoke.

## CIGARETTES AND DISEASES

14.     Scientific and medical evidence has established that cigarette smoking causes chronic obstructive pulmonary disease ("COPD"), emphysema, chronic bronchitis, coronary heart disease, lung cancer, of all cell types, laryngeal cancer, bladder cancer, and other cancers and diseases.  That is not to say that every smoker is going to develop a particular smoking related disease.  However, for each of these smoking-related diseases, smoking cigarettes is an independent risk factor for developing that particular disease.

15.     Each of the smoking-related diseases referenced above are dose dependent – that is, each and every exposure to cigarette smoke increases the risk of disease, including lung cancer.

## MODIFYING TOBACCO CONSTITUENTS

16.     Since the 1920s and certainly by the 1940s, RJR, including American Tobacco Company, Lorillard and B & W, its predecessors-in-interest, knew that nicotine could be removed from tobacco through thermal and other methods, so as not to create and sustain addiction and/or dependence.

17.     Since the early 1960s, RJR, including its predecessors-in-interest, have known that by using expanded tobacco, which increases tobacco filling capacity and renders the tobacco dryer and lighter when it is burned, there is

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

very little tar in the particulates from the burning tobacco, resulting in lower transmission of nicotine, and a less addictive cigarette.

18.     Beginning as early as the 1960s and continuing until the 1980s there have been commercially successful cigarettes on the market in the United States with modified levels of nicotine such that they would not create and sustain addiction, including Carlton cigarettes, manufactured by American Tobacco Company and introduced in 1964; NOW cigarettes, manufactured by RJR and introduced in 1976 and Cambridge cigarettes, manufactured by PM and introduced in 1980.

## EARLY TOBACCO USE

19.     Tobacco has been grown by humans for thousands of years, as far back as the Olmec civilizations and probably earlier.

20.     Tobacco was and is a very weedy plant, and therefore able to grow in various climates.

21.     Nicotine, a dangerous drug, occurs naturally in the tobacco plant and is addictive.

22.     When tobacco in cigarettes is burned the smoke from the tobacco contains numerous carcinogens and other toxic substances.

23.     Over the years, tobacco has been burned, chewed, swallowed, powdered and sniffed through the nose, such that almost every different human orifice at one time or another has been used with tobacco.

24.     During the 19th century, in the United States, the three most popular ways in which tobacco was used was chewing, smoking it in a pipe or smoking it wrapped in a tobacco leaf, commonly known as a cigar.   Smoking tobacco

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

wrapped in paper, known as a cigarette or small cigar, was another way in which tobacco was used during this time, but on a much smaller scale.

25.     During the 19th century, in the United States, the tobacco used to chew, smoke in a pipe, in a cigar or cigarette was air-cured, producing a very harsh alkaline smoke that could not be inhaled into the lungs.  Thus, it was very rare for people to inhale smoke of any kind prior to the 20th century.

26.     Accordingly, during the 19th century and continuing through the early 20th century in the United States, lung cancer was an extremely rare phenomenon.

27.     At some point during the 19th century in the United States, there was concern that the spitting that accompanied chewing tobacco might hasten the spread of tuberculosis, which was a common, albeit contagious and dangerous disease at that time.

28.     In the early 20th century, "flue cured" tobacco was used by companies in the United States that manufactured and sold cigarettes, including RJR and B & W.  "Flue curing" produced a milder, sweeter smoke that could be regularly inhaled.  That is because "flue curing" heated the tobacco during the curing process through tubes, known as flues, and trapped the native sugar in the tobacco leaf, producing a very mild inhalable smoke.

29.     In the early 20th century, menthol was used by companies in the United States that manufactured and sold cigarettes, including RJR and B & W.

### RISE IN SALES OF "FLUE-CURED" CIGARETTES

30.     Concerns about spitting tobacco causing the spread of tuberculosis was heightened during World War I, when soldiers were fighting together in

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

trenches and during the Spanish Influenza pandemic of 1918-1919.  As a result, soldiers and civilians began smoking flue-cured cigarettes as an alternative, putatively less dangerous form of tobacco use, replacing chewing tobacco.

31.    In addition to WW I and the Spanish Influenza, there were several other historical factors that were instrumental in popularizing cigarettes in the United States.  These included:

a.    the use of flue-cured tobacco, rendering the cigarette inhalable;

b.    the invention of safety matches, which made smoking mobile;

c.    the "Bonsack" machine, which produced up to 100,000 cigarettes per day and resulted in a drastic reduction in cigarette prices;

d.    WW II, when the U.S. Government provided free cigarettes that were included in soldier's rations as mini packs containing 3-4 cigarettes per day; and

e.    mass marketing, which included advertising though radio, television, billboards, human trademarks ("Call for Philip Morris!"), vending machines, skywriting and product placement in movies, where actors and actresses were paid by cigarette companies to smoke a particular cigarette brand.

32.    Statistics demonstrate the influence these historical factors had on the popularity of cigarettes, as smokers in 1900 consumed an average of 54 cigarettes per capita, while in 1960 smokers consumed an average of 4,171 cigarettes per capita.

## INHALABLE FLUE-CURED CIGARETTES
## CAUSE MANY CANCERS AND OTHER DEADLY DISEASES

33.    RJR and B & W, by using flue-cured tobacco, manipulated the design of Winston, Kool, and Salem cigarettes during the time that Ford smoked those cigarette brands.  This rendered them easily inhalable so that when used as intended, they were highly likely to cause, or contribute to in substantial

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

fashion, among other diseases and illnesses, COPD, emphysema, chronic bronchitis, lung cancer of all cell types, laryngeal cancer, stroke, bladder cancer, coronary artery disease and kidney cancer.

34.     Without the manufacturing designs utilized by RJR and B & W in their cigarettes, tobacco that was air-dried and rolled in paper would render the cigarette unreasonably harsh and therefore non-inhalable, resulting in little or none of the carcinogens and other toxic substances in the tobacco smoke reaching the lungs and therefore very few cases of lung cancer and other diseases.

35.     Without the manufacturing designs utilized by RJR and B & W in their cigarettes, tobacco that was air-dried and rolled in paper would render the cigarette unreasonably harsh and therefore non-inhalable, resulting in little or no nicotine reaching the brain and thus unable to create and/or sustain addiction or dependence.

**MANIPULATION OF NICOTINE LEVELS, INCLUDING "FREEBASING"**

36.     By as early as the 1930s, cigarette companies in the United States, that manufactured and sold cigarettes, including RJR and B & W knew that nicotine in cigarettes was the primary reason smokers continued to smoke cigarettes.

37.     By as early as the 1930s, cigarette companies in the United States, that manufactured and sold cigarettes, including RJR and B & W knew that nicotine could easily be removed from cigarettes by chemical and thermal methods.

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

38.     By as early as the 1930s, and probably earlier, and continuing to even today, cigarette companies in the United States that manufactured and sold cigarettes, including RJR and B & W have manipulated the levels of nicotine in their cigarette products to a certain consistent amount, including those cigarettes smoked by Ford, so as to create and sustain addiction and/or dependency and habituation to the nicotine in their cigarettes, resulting in excessive exposure to carcinogens and other toxic substances, likely leading to the development of various types of respiratory diseases, including lung cancer.

39.     By at least in or around the late 1960s and continuing to at least as late as today, RJR and B & W have manipulated the potency of the nicotine in the cigarettes they manufactured and sold, including cigarettes smoked by Ford, namely Winston, Kool and Salem, by adding ammonia and/or diammonium phosphate or other hydroxides to the tobacco in their cigarettes, that transformed the nicotine molecule from a salt state to a free state.  This transformation, referred to as "freebasing," resulted in the nicotine being in a more volatile, potent form, rapidly absorbed by the smoker, and instantly perceived by the smoker as a nicotine "kick," leading to earlier onset of addiction to the nicotine in those cigarettes, creating an unreasonable risk of danger to the user, including Ford, when Winston, Kool, and Salem cigarettes were put to normal use, by virtue of excessive exposure to carcinogens and other toxic substances in those cigarettes, likely to cause or contribute to, in substantial fashion, lung cancer and other diseases.

40.     RJR and B & W, by increasing the quantity and potency of the nicotine, manipulated the design of Winston, Kool, and Salem cigarettes during

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

the time that Ford smoked those cigarette brands.   This rendered these cigarettes more addictive and habituating so that when used as intended, they were highly likely to cause, or contribute to, in substantial fashion, among other diseases and illnesses, COPD, emphysema, chronic bronchitis, lung cancer of all cell types, laryngeal cancer, stroke, bladder cancer, coronary artery disease and kidney cancer.

41.    While nicotine occurs naturally in the tobacco plant there are numerous variables that determine the amount of nicotine in the plant, including the spacing of the plants, the particular climate conditions and the particular leaves that are used in manufacturing cigarettes.   That said, without the manufacturing designs utilized by RJR and B & W in their cigarettes, tobacco that was air-dried and rolled in paper would not only be unreasonably harsh and non-inhalable, but there would be fluctuations in the amount of nicotine in the tobacco, rendering the cigarette either too harsh due to too much nicotine and thus, not palatable or with not enough nicotine to create and sustain addition and/or dependence.

42.    As a result of Ford smoking Winston, Kool, and Salem cigarettes, manufactured, distributed and sold by RJR and B & W, the designs of which were manipulated through the use of flue-cured tobacco, consistent addictive levels of nicotine and the use of menthol and other flavorings, he became addicted to the nicotine in the cigarettes he smoked and/or the consistent addictive levels sustained his addiction to the nicotine in the cigarettes he smoked, resulting in excessive exposure to carcinogens and other toxic substances in the Winston, Kool, and Salem cigarettes he smoked over the many

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

decades of his smoking history.  This cumulative exposure caused or contributed to, in substantial fashion, the development of Ford's lung cancer.

## "TIRC" AND "CTR":
## THE CIGARETTE MAKERS CONSPIRE
## TO DENY THAT CIGARETTES CAUSE CANCER

43.     In 1953, Dr. Ernst Wynder published an article titled, "*Experimental Production of Carcinoma with Cigarette Tar"* in the journal Cancer Research.  Dr. Wynder had conducted experiments painting cigarette tar on the backs of mice, which then developed tumors on their backs.

44.     That same year, cigarette makers, including RJR and B & W hired scientists who confirmed that cancer rose dramatically as people smoked more cigarettes.

45.     Indeed, in a February 2, 1953 internal report, RJR concluded that, "studies of clinical data tend to confirm the relationship between heavy and prolonged tobacco smoking and incident of cancer of the lung."

46.     In response to these early research studies, cigarette makers including RJR and B & W have carried out, and continue to carry out a campaign designed to deceive the public, Ford, physicians, federal and state governments, and others as to the true dangers of smoking cigarettes and for many years succeeded in their endeavor.

47.     In or around December 1953, cigarette makers including RJR, B & W and others, met at the Plaza Hotel in New York City and reached what has been called a "gentlemen's agreement" with the object of conspiring to defraud the public.

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

48.　　In January 1954, these cigarette makers, and others, formed and funded the "Tobacco Industry Research Committee" (TIRC).  The TIRC expressly pledged to provide aid and assistance to the research effort into all phases of cigarette use and health, expressly undertaking an interest in health as their basic responsibility paramount to every other consideration -- thereby affirmatively assuming a duty to disclose any adverse information regarding the health hazards of smoking.

49.　　On January 4, 1954, the TIRC published an advertisement in over 400 newspapers circulated in North America titled, "A Frank Statement To Cigarette Smokers," making claims about the safety of cigarette smoking which were thereafter reiterated and reinforced by advertisements and public interviews given by cigarette executives over the next several decades.   Among other representations these conspirators knew were false, the "Frank Statement" claimed, "That there is no proof that cigarette smoking is one of the causes" of "lung cancer."

50.　　A March 15, 1961 confidential Liggett & Meyers document stated in part, "There are biologically active materials present in cigarette tobacco.  These are: a) cancer causing b) cancer producing, c) poisonous . . . ."

51.　　In 1964, the TIRC changed its name to the "Council on Tobacco Research" (CTR) and was joined by co-conspirator Liggett & Myers.

52.　　Despite RJR, B & W and other cigarette company's "promise," which purposely created the illusion that scientific research into the dangers of smoking was being conducted, the results of which would be made public, they concealed information regarding the lack of bona fide research being done by the

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

TIRC and CTR into the health hazards of smoking, and the lack of funds being provided for research by the TIRC and CTR into the health hazards of cigarettes, which was the purported purpose for which the TIRC and CTR were established.

53.     The truth is that joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that TIRC and CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. Instead, the TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease.  At the same time, the cigarette makers including RJR and B & W, continued to represent publicly that there was no proof that cigarette smoking was one of the causes of, or contributing factors to, cancer or any other diseases.

54.     In order to sell more cigarettes over the last 65 years, TIRC and its successor CTR, together with the Tobacco Institute Inc. ("TI") formed in 1958, and cigarette manufacturers including RJR and B & W, withheld, denied and failed to disclose the truth they knew about the dangers of cigarette smoking, including that cigarettes are highly addictive and caused lung cancer, COPD, emphysema, chronic bronchitis, and other diseases.   Meanwhile, these conspirators repeatedly promised the public that they would truthfully disclose relevant information regarding the health risks associated with their cigarettes.

55.     The success of this conspiracy depended upon the concerted action of the cigarette makers (in a so-called "gentleman's agreement"). Otherwise the revelation by one company of what it knew about the health consequences of smoking and/or the availability of a "safe" or "safer" cigarette

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

and/or the addictive nature of the manufacturers' cigarette would have thwarted the conspiracy.

56.    RJR, B & W and other cigarette company's internal company documents prove that they knew the dangers of smoking but withheld this information from Ford, at the time he began smoking their cigarettes and for decades after.

## THE FRAUD OF FILTERS

57.    As early as the 1950s, the cigarette makers' internal company documents, including RJR and B & W, reflected the ineffectiveness of filters in removing cancerous components.   Nevertheless, the tobacco companies, including RJR and, B & W and other co-conspirators, through their advertising campaigns, via radio, television and other media outlets, throughout the 1950s and 1960s and beyond, subtly noted that filters were safer and "better" than unfiltered cigarettes.

58.    In a December 17, 1953 internal RJR document, titled, "Filter Tip Materials Undergoing Color Change on Contact with Tobacco Smoke", Claude Teague, an RJR chemist, discussed the possibility of using chemicals in the filter tip materials that would darken or change color on contact.  He concluded, "While use of such color change materials would probably have little or no effect on the actual efficiency of the filter tip material, the advertising and sales advantages are obvious."

59.    That year, a confidential Philip Morris Inc. document titled "*Tobacco and Health – R&D Approach*" concluded, "Carcinogens are found in practically

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

every class of compound in smoke . . . filtration does not permit selective filtration of particulate smoke."

**FROM THE 1960's AND CONTINUING
FOR MANY DECADES, RJR AND ITS
CO-CONSPIRATORS FALSELY DENIED
KNOWING THAT CIGARETTES WERE DEADLY**

60.     An April 15, 1968 internal Tobacco Institute memorandum stated, "Our basic position in the cigarette controversy is subject to the charge, and may be subject to a finding, that we are making false or misleading statements to promote the sale of cigarettes."

61.     The cigarette manufacturers, including RJR and B & W, questioned any scientific research that concluded that cigarettes were a health hazard, either directly or through the TI, through media campaigns, mailings to doctors and other scientific professionals, as well as through testimony before governmental bodies. As examples:

a.  From the mid-1950s through at least the 1970s, executives from RJR, B & W, and other cigarette companies frequently appeared on television news shows, such as "See It Now," hosted by Edward R. Murrow, to refute any contention that cigarettes were a cause of cancer or otherwise dangerous to health.

b.  In 1964, when the Surgeon General's Report was issued and became one of the most covered news stories in recent times because of its conclusion that cigarettes were a cause of lung cancer in men, RJR and B & W executives responded on national and international television programming, local news stations and local newspapers throughout the United States, denying that cigarettes were a cause of lung cancer or any other type of cancer and cautioning that more research was needed before that determination could be made.

c.  Throughout the 1970s and 1980s, TI (on behalf of RJR, B & W and other cigarette companies who provided funding to TI) used spokespeople, including Anne Browder, Bill Dwyer and Brennan Dawson, who appeared on national television programs and local television programs throughout the United States including Missouri

17

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

and denied any causal connection between smoking and disease. The common mantra among the various spokespersons, was that there was no causal connection between smoking and disease, including cancer, there were not enough facts to conclude that smoking was a cause of cancer and that only a small percentage of smokers developed cancer.

d.   In 1983, a TI spokesperson publicly stated, "We don't know what causes the ailments that have been attributed to cigarette smoking . . . I don't think that there's a causal relationship established between cigarette smoking and any disease."

e.   In 1984, RJR took out advertisements in major newspapers and magazines calling for an open debate regarding smoking's danger, which would show that smoking does not cause cancer.

f.   A tobacco spokesperson stated in 1984 that "[i]t is not known whether cigarettes cause cancer."

g.   After the 1988 Surgeon General's report asserted that nicotine was addictive, the Tobacco Institute released a statement that said, "it has not been established that cigarette smoking produces a physical dependence to nicotine."

h.   In 1988 the tobacco companies, including RJR and B & W publicly denounced the Surgeon General's conclusion on addiction, calling the report "irresponsible.

i.   In 1994, cigarette company executives from RJR, B & W and other cigarette companies, testified under oath before Congress that nicotine was not addictive and that "it has not been proven that cigarette smoking causes cancer.  This appeared on C-Span, and news of this testimony was covered by local news stations throughout the United States, including St. Louis.

62   Meanwhile, beginning in the 1950's and well before Ford began smoking cigarettes, in the early 1970s, RJR, B & W and other cigarette manufacturers willfully concealed their knowledge of the health dangers of cigarettes, including:

a.   the results of their own research into the health dangers posed by smoking cigarettes, including but not limited to the results of mouse skin painting experiments which proved that RJR and B & W's cigarettes did in fact contain carcinogens;

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

b.   that smoking cigarettes greatly increased the risk of a smoker developing COPD, lung cancer of all cell types, emphysema, chronic bronchitis, laryngeal cancer, stroke, bladder cancer, coronary artery disease, kidney cancer and other forms of cancer, and/or sustaining other injuries and/or damages to the lungs, respiratory system, immune system, genetic makeup and other related physical conditions when used as intended;

c.   that smoke from RJR, B & W, and other company's cigarette products caused damage to a smoker's respiratory tract, including but not limited to the ciliary escalator system utilized by the body to remove foreign particles from the lungs increasing the risk of the smoker of contracting various respiratory ailments, including COPD, emphysema and chronic bronchitis as well as  lung cancer of various cell types;

d.   that the diseases and/or injuries listed above would be more likely experienced if users such as Ford did not restrict their intake of RJR, B & W and other company's cigarettes, or if they began to use such products at an early age;

e.   that use of RJR, B & W and other company's cigarettes as intended was more likely than not to lead to addiction, habituation, physical and/or psychological dependence, particularly if begun at an early age;

f.   their failure to conduct adequate testing to determine whether cigarette smoking did lead to cancer and other diseases, including lung cancer, COPD, emphysema and chronic bronchitis;

g.   the importance of animal experiments in determining the ability of cigarettes to cause disease in humans;

h.   the importance of epidemiological evidence in determining the ability of cigarettes to cause disease in humans;

i.   that reducing the number of cigarettes smoked per day would greatly reduce the risk of contracting a cigarette related disease, including, COPD, emphysema, chronic bronchitis, lung cancer and other smoking related diseases;

j.   that smoking in excess of 5 cigarettes per day would likely lead to an addiction to or dependence on nicotine;

k.   the addictive and dependence producing nature of nicotine as contained in cigarette smoke;

l.      that termination or limitation of use would be exceedingly difficult if consumption were initiated and that this difficulty would increase as cumulative consumption increased;

m.      the use of ammonia technology and/or certain tobacco blends to boost the pH of the cigarette smoke so as to increase the ratio of the "free base" form of nicotine (which is more easily absorbed by the smoker) to the acid salt form of nicotine (which is less readily absorbed) so as to allow for greater and more rapid absorption of nicotine by the smoker at lower levels of total dose rending the free nicotine more potent and more addictive than bound nicotine;

n.      the use of tobacco high in nitrosamines, a potent carcinogen not found in green tobacco leaf but created during the tobacco curing process;

o.      that cessation of smoking, while reducing the risk of contracting certain cigarette related diseases, does not eliminate all risk;

p.      that cigarette smoking permanently alters certain receptor cites in the brain for nicotine making it more likely such individual will become or continue to be addicted to and/or dependent upon nicotine;

q.      that use of mild tobaccos, re-constituted tobacco, tobacco casings and flavorings, including menthol, in the manufacture of RJR and B & W's cigarettes led to a cigarette less likely to trigger the smoker's own biological self defense mechanisms, the smoke of which was easier to inhale, inhale more deeply and hold in the lungs for a longer period of time which resulted in increased doses of carcinogens, such as Polycyclic Aromatic Hydrocarbons ("PAHs") and nitrosamines, and nicotine for the smoker even at lower levels of machine measured tar and nicotine yields;

r.      that switching to or initially smoking filtered, menthol, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced;

s.      that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker;

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

t.      the dose-response relationship between various toxic substances contained in cigarette smoke and the risk of contracting COPD, emphysema, chronic bronchitis, lung cancer of various cell types and other respiratory diseases;

u.      that cigarette manufacturers and sellers could develop a reasonable safe dose for foreseeable users;

v.      that there were feasible improvements in design, composition or manufacture of cigarettes such as to materially decrease the foreseeable risk to users such as Ford; and

w.      that developing knowledge before and after 1970 demonstrated that previous users are at great risk of harm, as set forth above, and should seek medical monitoring.

### MR. FORD DIDN'T KNOW THE HEALTH RISKS

63.     When Mr. Ford began to smoke cigarettes at the age of 15, until many decades later, he did not have actual knowledge of the likelihood of, or the severity of, the risks from the cigarettes he smoked, as indicated above, including the fact that smoking cigarettes could cause lung cancer, and other cancers, COPD, emphysema, chronic bronchitis or any other smoking related diseases. .

64.     At the time that Ford first began to smoke cigarettes until many decades later, he did not have actual knowledge of the likelihood of becoming addicted and/or dependent on the nicotine in the cigarettes he smoked, much less the fact that cigarettes contained nicotine and that nicotine was a dangerous addictive drug.

65.     The risks of harm to foreseeable users, as listed above, would increase with greater cumulative consumption, including the rate of consumption and length of time the cigarette products were consumed as well as with the earlier age in life of smoking initiation.

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

**CIGARETTE MAKERS'
AGGRESSIVE MARKETING
WITH SUPERIOR KNOWLEDGE**

66.     At all times material to this action, RJR, B & W and other cigarette companies conducted aggressive marketing and advertising campaigns intended to induce, encourage, suggest and reinforce foreseeable users, including but not limited to, children, teenagers, and others to purchase their cigarette products.

67.     RJR, B& W and other cigarette companies targeted, among other groups, children and teenagers, with their aggressive marketing and advertising campaigns, subtly portraying their products as safe and harmless, with the purpose of initiating them to their cigarette products, intending for them to become addicted to the nicotine in the cigarettes they smoked and thereby becoming loyal, longtime users of their cigarette products.

68.     Such marketing and advertising occurred in printed media, including various magazines that had a large teenage readership; on television, which included many television programs on prime time, that had large teenage and children viewers; radio, billboards and by other means.  For example:

a.     For decades, beginning in the 1930s and continuing even until today, cigarette companies, including RJR and B & W used mass marketing to sell their cigarette products, including Winston, Kool, and Salem, with famous athletes, politicians, actors and actresses pitching cigarette products on radio, television, magazine and newspaper advertisements and billboards.

b.     Through their advertisements, beginning in the 1930s, cigarette companies, including RJR and B & W, glamorized, sexualized and normalized cigarette smoking, creating a culture where cigarette smoking throughout the United States was ubiquitous, until 1982 when cigarette consumption peaked and thereafter began to decline such that the number of smokers today parallels the number of smokers in the 1930s.  However, it was not until 2002 that the number of former smokers has been greater than the number of current smokers.

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

    c.    From the 1930s at least through the late 1990s, cigarette advertisements celebrated happy relationships, a fun, carefree lifestyle, outdoor sporty activities, physical fitness, beauty and independence.  However, while extolling these traits, the advertisements failed to advise of the health risks and addictiveness of smoking cigarettes, choosing instead to conceal that information.

69.    In the early 1950s through at least the early 1980s, in Missouri and elsewhere around the country, B & W heavily promoted Kool mentholated filter cigarettes through various media outlets, including radio, local newspapers, magazines, television (until late 1970), and billboards, using catchy jingles and misleading euphemisms to conceal the hazards of smoking, such as, "mild, refreshing menthol," " tastes so clean and refreshing," "snow-fresh coolness of Kool," "pure white filter," "come up to the Kool taste," "world's most thoroughly tested filter," and "as Kool and as clean as a breath of fresh air."

70.    In the mid-1950s through at least the early 1980s, in Missouri and elsewhere around the country, RJR heavily promoted Winston filtered cigarettes through various media outlets, including radio, local newspapers, magazines, television (until late 1970) and billboards, using catchy jingles and phrases as, "best tasting," "finer filter, finer flavor," "filter lets the flavor through," and "Winston tastes good like a cigarette should." For example:

    a.    The Beverly Hillbillies, a popular primetime sitcom, especially with children and teenagers, was sponsored by Winston cigarettes. Certain members of the cast appeared in Winston cigarette commercials at the end of each show.

    b    The Flintstones, a popular primetime cartoon sitcom, that attracted a large viewing audience of children and teenagers, was sponsored by Winston cigarettes for the first three years the show aired.  The animated characters would appear in Winston cigarette commercials at the end of each show.

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

71.     In the mid-1950s through at least the early 1980s, in Missouri and elsewhere around the country, RJR heavily promoted Salem menthol cigarettes through various media outlets, including radio, local newspapers, magazines, television (until late 1970) and billboards, using catchy jingles and phrases as, "Salem softness freshens your taste," "menthol taste is country fresh" and "you can take Salem out of the country but you can't take the country out of Salem."

72.     Only recently has the extent of RJR, B & W and other cigarette companies' concealment been exposed.  Thus:

a.     According to the 2010 United States Surgeon General Report, <u>How Tobacco Smoke Causes Disease, The Biology and Behavioral Basis for Smoking-Attributable Disease,</u> "The evidence indicates that changing cigarette designs over the last five decades, including filtered, low-tar, and "light" variations, have not reduced overall disease risk among smokers and may have hindered prevention and cessation efforts."

b.     According to the 2014, United States Surgeon General Report, <u>The Health Consequences of Smoking – 50 Years of Progress,</u> "The tobacco epidemic was initiated and has been sustained by the aggressive strategies of the tobacco industry, which has deliberately misled the public on the risks of smoking cigarettes."

73.     Ford was induced to purchase cigarette products, relied upon the manufacturers' superior knowledge regarding cigarette products and was impliedly or expressly instructed in their use by RJR, B & W and other cigarette company's advertising, marketing and other efforts.

**SELLING CIGARETTES TO MR. FORD**

74.     Ford began smoking cigarettes in or around the early 1970s when he was around 15 and living in St Louis City.  For the first year, his smoking was intermittent, limited to smoking Winston cigarettes he "confiscated" from his father.  After about one year of sporadic smoking, Ford was able to buy his own

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

cigarettes, as he had begun working at various jobs.  At 16, Ford began smoking Kool menthol cigarettes and became a regular smoker, smoking about a pack and a half to two packs of cigarettes a day.  Ford also smoked Salem menthol cigarettes for many years. During his almost 50 years of smoking cigarettes, Ford smoked Winston, Kool, and Salem cigarettes in sufficient quantities such that his cumulative exposure to the carcinogens and other toxic substances in the cigarettes he smoked caused and/or directly contributed to the development of his lung cancer.

75.    While living in St. Louis Ford purchased Kool and Salem cigarettes from various convenience stores and grocery stores, including, Schnucks, in the St. Louis City and County area.

76.    Andrew's purchases of cigarettes from Schnucks, that he smoked and inhaled, were in sufficient quantities such that they caused and/or directly contributed to the development of his lung cancer.

77.    While growing up in St. Louis, Ford saw the ubiquitous cigarette advertisements from the cigarette companies in the various media outlets, including magazines (such as Jet and Ebony), billboards and television, from RJR, B & W and other cigarette companies.  Thus, by the time Ford started smoking cigarettes, he was very familiar with the "coolness" of Kool, "country fresh" taste of Salem, and "Winston tastes good like a cigarette should."

78.    Additionally, from the 1970s through the 2000s, Ford had heard, seen and read about the various public pronouncements from the cigarette companies referenced above, including RJR and B & W, directly or through their representatives, including TI, when the pronouncements were aired on local and

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

national television programs that Ford watched, as well as on the local radio stations that Ford listened to, and appeared in local newspapers and magazines that Ford read, denying that smoking was a causal factor of smoking-related diseases and attacking government officials who espoused the causal link between smoking cigarettes and cancer and any other diseases.  It was these public pronouncements along with the ubiquitous cigarette advertisements that Ford had seen and heard, that informed his confusion and ultimate belief that smoking was not yet proven to be a cause of lung cancer and other illnesses, including COPD, until many decades later.  Unfortunately, and to his detriment, Ford chose to trust the cigarette companies including RJR and B & W, who manufactured and sold the cigarettes he smoked, to be truthful about the health risks of their products, namely, that they caused lung cancer and other diseases.

79.    Ford was unaware of the extent of the danger and the addictive nature of RJR and B & W's cigarette products, including the Winston, Kool, and Salem cigarettes he smoked and that "light," "ultra-light," low tar, low nicotine and/or filtered cigarettes were just as dangerous as unfiltered cigarettes.

80.    The cigarettes manufactured by RJR and B & W, during the time that Ford smoked them, contained tobacco that was flue cured, menthol and other flavorants, rendering the cigarettes easily inhalable, and those cigarettes had levels of nicotine that RJR and B & W intentionally manipulated, as a design choice, resulting in every Winston, Kool and Salem cigarette Ford smoked having a consistent amount of nicotine so as to create and thereafter, sustain addiction and/or dependence and be able to easily reach the lungs through inhalation,

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

thereby creating an unreasonable risk of danger to the user, including Ford, when put to normal use.

## DEFENDANTS' CIGARETTES
## CAUSED MR. FORD'S LUNG CANCER

81.     In or around November, 2019, Ford was diagnosed with squamous cell lung cancer, caused by his substantial exposure to the various components, including carcinogens and toxic substances in the Winston, Kool, and Salem cigarettes he smoked, that were designed, manufactured, advertised, marketed, distributed and/or sold by RJR and B & W.

82.     As a further direct result of RJR and B & W's actions, Ford has suffered serious bodily injury, on-going pain throughout his body, coughing and breathing problems, loss of enjoyment of life and disability from the date of his diagnosis through the present, and will likely endure future permanent pain and disability.

## SPECIFIC ALLEGATIONS

### COUNT I: STRICT LIABILTY (Design Defect)
### R.J. REYNOLDS TOBACCO COMPANY

COMES NOW Plaintiff Eugene Ford and for Count I of his cause of action against Defendant RJR, directly and through successor liability, states as follows:

83.     Ford repeats and re-alleges paragraphs 1-82 of this Petition.

84.     RJR is and has been a designer, manufacturer, advertiser, distributor and/or seller of cigarette products.

85.     The products complained of were cigarette products designed, manufactured, advertised, distributed and/or sold by RJR and B & W and used by Ford, including Winston, Kool, and Salem cigarette products.

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

86.     These products were distributed, supplied, sold and/or otherwise placed into the stream of commerce, and/or caused to be placed into the stream of commerce, by RJR and B & W.

87.     RJR and B & W's cigarette products, by reason of their design, were in an unreasonably dangerous defective condition to users such as Ford, when put to a reasonably anticipated use.

88.     At the time RJR and B & W designed, manufactured, advertised, marketed, distributed and/or sold these cigarette products, such products were expected to and did reach Ford, in a condition without substantial change from that in which such products were when within the possession of the manufacturer.

89.     There were no material alterations to, or modifications of, cigarettes manufactured by RJR and B & W between the time of their manufacture and the time Ford smoked them.

90.     As a direct result of RJR and B & W's unreasonably dangerous defective cigarette products, Ford developed squamous cell lung cancer, in addition to other related physical conditions, as a result of such defective condition as existed when the cigarette products were sold.

91.     The allegations herein demonstrate that RJR, directly and through successor liability, placed in commerce cigarette products that were in an unreasonably dangerous defective condition, with actual knowledge of their defective design as well as the foreseeable risks that the defective design of its cigarette products would directly cause those harms listed in paragraph 14 above. The allegations herein evince RJR's willful outrageous conduct showing a reckless

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

indifference to the rights of others, including Ford, or the consequences of its acts so as to justify an award of punitive damages.

WHEREFORE, Plaintiff, Eugene Ford, prays for a fair and reasonable judgment against Defendant RJR, in excess of $25,000.00, including punitive damages, in a sum that will punish Defendant RJR and deter it and others from like conduct, together with his costs and for such other and further orders as the Court may deem proper under the circumstances.

### COUNT II:  NEGLIGENT DESIGN
### R.J. REYNOLDS TOBACCO COMPANY

COMES NOW Plaintiff Eugene Ford and for Count II of his cause of action against Defendant RJR, directly and through successor liability, states as follows:

92.    Ford repeats and re-alleges paragraphs 1-82 of this Petition.

93.    The products complained of, including Winston, Kool, and Salem cigarettes, were designed, manufactured, advertised, marketed, distributed and/or sold by RJR and B & W, which Ford used and smoked in his daily life.

94.    RJR and B & W had a legal duty to protect users who consumed their cigarette products, including Ford, from injury, to design, manufacture and sell a product that when used as intended was reasonably safe for foreseeable users.

95.    RJR and B & W breached their legal duty by designing, manufacturing and selling Winston, Kool, and Salem cigarettes that were unreasonably dangerous and defective when used as intended by consumers.

96.    RJR and B & W knew that Winston, Kool, and Salem cigarette products would be used by Ford and other foreseeable users, without inspection for defects and that any such inspection would not have advised Ford of the fact that RJR and B & W's cigarette products could cause the injuries which he suffered.

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

97.     There were no material alterations to, or modification of, Winston, Kool, and Salem cigarettes manufactured by RJR and B & W, between the time of their manufacture and the time Ford smoked them.

98.     The cigarette products to which Ford was exposed, were put to a reasonably anticipated use.

99.     As a direct result of RJR and B & W's negligence, Ford developed squamous cell lung cancer, in addition to other related physical conditions.

100.    The allegations herein demonstrate that RJR and B & W, at the time of their negligent acts, knew or had reason to know that there was a high degree of probability that those acts would result in injury, including those harms listed in paragraph 14 above, to Ford and like users of their cigarette products,.  Further, the allegations herein demonstrate RJR and B & W's willful outrageous conduct showing a reckless indifference to the rights of others, including Ford, or the consequences of their acts so as to justify an award of punitive damages.

WHEREFORE, Plaintiff, Eugene Ford, prays for a fair and reasonable judgment against Defendant RJR in excess of $25,000.00, including punitive damages, in a sum that will punish Defendant RJR and deter them and others from like conduct, together with his costs and for such other and further orders as the Court may deem proper under the circumstances.

## COUNT III:  FRAUDULENT CONCEALMENT
### R.J. REYNOLDS TOBACCO COMPANY

COMES NOW Plaintiff Eugene Ford, and for Count III of his cause of action against Defendant RJR, directly and through successor liability, states as follows:

101.    Ford repeats and re-alleges paragraphs 1-82 of this Petition.

102.    Over the course of the last 65 years, RJR and B & W made false

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

representations of material facts to consumers, including Ford, about the health hazards of cigarettes and their addictive nature.

103.    RJR and B &W have concealed vast amounts of truthful information regarding the health hazards of their cigarettes and their addictive nature over the course of the last 65 years.  Indeed, it is the cigarette manufacturers themselves, including RJR and B & W who have this knowledge and information, and are in the best position to know the contents of each and every such concealed fact.

104.    By making public pronouncements and statements referenced above, in addition to other such statements made to its customers, RJR and B & W assumed voluntarily a duty otherwise imposed by law to fully and honestly disclose to Ford and others, all relevant and material information regarding the health consequences of cigarette smoking and to refrain from making false and misleading statements in that regard.

105.    The aforementioned information and/or knowledge concealed and/or suppressed by RJR and B & W was material information which they were under a duty to disclose and/or which they had assumed the duty of disclosing.

106.    The aforementioned information and/or knowledge concealed and/or suppressed by RJR and B & W was concealed for the purposes of inducing Ford to smoke, fail to quit or reduce consumption for their own pecuniary gain.

107.    When RJR and B & W made the above referenced representations, including pronouncements made in advertising and promotional activities for their cigarette products, and concealed material information regarding the health risks and addictiveness of smoking cigarettes, they knew or should have known that such concealed information was material to persons such as Ford in making

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

decisions on smoking and that such persons would rely and did rely upon RJR and B & W's false and misleading statements that concealed material information regarding the health risks and addictiveness of smoking cigarettes.

108.   RJR and B & W intended to induce Ford to act or rely on the false and misleading statements that concealed material information about the health risks and addictiveness of their cigarette products.

109.   Ford reasonably relied, to his detriment, upon RJR and B & W's misleading and false statements that concealed material information regarding the health risks and addictiveness of smoking cigarettes.   The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including RJR and B & W, was concealed for the purposes of inducing Ford to smoke, fail to quit or reduce consumption.

110.   As a direct result of RJR and B & W's concealment fraud, Ford developed squamous cell lung cancer, in addition to other related physical conditions.

111.   If RJR and B & W had disclosed the material truthful information they possessed about the health risks and addictiveness of their cigarette products, including, Winston, Kool, and Salem, more likely than not, Ford would not have started smoking cigarettes and therefore avoided the development of his squamous cell lung cancer.

112.   The allegations herein demonstrate that RJR and B & W, at the time of their fraudulent concealment, committed intentional, wanton, willful and outrageous acts without justification, thus evincing an evil motive or reckless indifference to, or a conscious disregard for the safety of others, so as to justify an

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

award of punitive damages.

WHEREFORE, Plaintiff, Eugene Ford, prays for a fair and reasonable judgment against Defendant RJR in excess of $25,000.00, including punitive damages, in a sum that will punish Defendant RJR and deter them and others from like conduct, together with his costs and for such other and further orders as the Court may deem proper under the circumstances.

**COUNT IV:  CONCEALMENT FRAUD CONSPIRACY**
**R.J. REYNOLDS TOBACCO COMPANY**

COMES NOW Plaintiff Eugene Ford and for Count IV of his cause of action against Defendant RJR, states as follows:

113.    Ford repeats and re-alleges paragraphs 1-82 of this Petition.

114.    On or about December 14, 1953, at the Plaza Hotel, New York, N.Y., RJR, along with other cigarette manufacturers, including, among others, American Tobacco Company, Lorillard, B & W and the TIRC, unlawfully agreed to conceal or omit, and did in fact conceal or omit, information regarding the health effects of cigarettes or their addictive nature, with the intention that smokers and the public would rely on this information to their detriment. The conspirators agreed to execute their scheme by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means.  They were later joined by the TI and CTR.  For the next 65 years the scheme was well-executed and successful.

115.    The concealed and omitted information referred to in the preceding paragraph and elsewhere herein, was material information.

116.    By making public pronouncements and statements referenced above, in addition to other such statements made to their customers, RJR and other co-

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

conspirators, assumed voluntarily a duty otherwise imposed by law to fully and honestly disclose to Ford and others, all relevant and material information regarding the health consequences of cigarette smoking and to refrain from making false and misleading statements in that regard.

117.    Ford relied to his detriment on the misleading and false statements by one or more of the conspirators, that concealed material information regarding the health risks and addictiveness of smoking cigarettes, including Winston, Kool, Salem and other cigarettes.

118.    As a direct result of the aforementioned conspiracy to conceal and/or suppress material information by RJR and its coconspirators, Ford developed squamous cell lung cancer, in addition to other related physical conditions.

119.    If RJR and other co-conspirators had disclosed the material truthful information they possessed about the health risks and addictiveness of their cigarette products, including, Winston, Kool, Salem, and others, more likely than not, Ford would not have started smoking cigarettes and therefore avoided the development of his squamous cell lung cancer.

120.    The allegations herein demonstrate that RJR, at the time of the conspiracy to commit fraudulent concealment, committed intentional, wanton, willful and outrageous acts without justification, thus evincing an evil motive or reckless indifference to, or a conscious disregard for the safety of others, including Ford, so as to justify an award of punitive damages.

WHEREFORE, Plaintiff, Eugene Ford, prays for a fair and reasonable judgment against Defendant RJR in excess of $25,000.00, including punitive damages, in a sum that will punish Defendant RJR and deter them and others

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

from like conduct, together with his costs and for such other and further orders as the Court may deem proper under the circumstances.

### COUNT V:  STRICT LIABILITY
### SCHNUCK MARKETS, INC.

COMES NOW Plaintiff Eugene Ford and for Count V of his cause of action against Defendant Schnuck Markets, Inc., states as follows:

121.    Ford repeats and re-alleges paragraphs 1-82 of this Petition.

122.    At all times relevant to this action, Schnucks was in the business of selling products for use or consumption, including cigarette products manufactured by RJR and B & W that Ford smoked.

123.    There were no material alterations to or modifications of cigarettes manufactured by RJR and B & W between the time of their manufacture and the time in which they were subsequently distributed to various retail outlets throughout the St. Louis area, including Schnucks, when they were sold through the stream of commerce, to, among others, Ford, who smoked them.

124.    At all times relevant to this action, the cigarettes that Schnucks and placed into the stream of commerce for sale, including those that Ford purchased and smoked, were in an unreasonably dangerous defective condition when put to a reasonably anticipated use.

125.    As a direct result of such defective condition as existed when the cigarettes were sold, Ford developed squamous cell lung cancer, in addition to other related physical conditions, which resulted in and directly caused him to suffer severe bodily injuries.

WHEREFORE, Plaintiff, Eugene Ford, prays for a fair and reasonable judgment against Defendant, Schnucks, in excess of $25,000.00, together with

Electronically Filed - City of St. Louis - September 19, 2020 - 04:40 PM

his costs and for such other and further orders as the Court may deem proper under the circumstances.

DATED: September 19, 2020          TEIN MALONE, PLLC

                                   11045 SW 69th Avenue
                                   Pinecrest, FL  33156
                                   (Phone) 305-442-1101
                                   Email:  akaiser@teinmalone.com
                                   *Attorneys for Plaintiff*

                               By: /s/ ALLAN B. KAISER
                                   ALLAN B. KAISER #32359MO